MICHELLE A. BLACKWELL, OSB #002070
Email: mblackwell@blackwell.law
BLACKWELL LAW, P.C.
747 Blair Blvd.
PO Box 10326
Eugene, OR 97440
Telephone: (541) 345-8800
        **Co-counsel for Plaintiff**
        **Kabushiki Kaisha Too Marker Products**


DAVID A. MAKMAN, CSB #178195  (to be admitted pro hac vice)
Email: david@makmanlaw.com
THE LAW OFFICES OF DAVID A. MAKMAN
483 Seaport Court, Suite 103
Redwood City, CA 94063
Telephone: (650) 242-1560
        **Co-Counsel for Plaintiff**
        **Kabushiki Kaisha Too Marker Products**


### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

Eugene Division

| | |
|---|---|
| KABUSHIKI KAISHA TOO MARKER PRODUCTS, INC., a Japanese Corporation, filing on its own behalf and as a derivative action Plaintiff,<br><br>            Plaintiff,<br><br>    v.<br><br>GLOBAL CREATIVE, INC., an Oregon Corporation, JOHN DARLAND, an individual, HILLARY DARLAND, an individual, TAKUMA TAKAHARA, an individual, and IMAGINATION INTERNATIONAL, INC., an improperly dissolved Oregon Corporation.<br><br>            Defendants. | Case No. 6:21-cv-01115<br><br> **COMPLAINT** |

For their Complaint, Plaintiff Kabushiki Kaisha Too Marker Products, Inc. ("TMP") hereby alleges as follows:

### The Parties

1.        Plaintiff TMP is a Japanese Corporation, with its headquarters at TOC Bldg. 8F, 7-22-17 Nishi-Gotanda, Shinagawa-ku, Tokyo 141-0031 Japan.  TMP owns 25 percent of the common shares of Imagination International, Inc. ("III") and therefore has standing to bring the derivative claims herein asserted against the Darlands and Takahara, the directors and majority shareholders of III.

2.        Defendants John and Hillary Darland (the "Darlands") are husband and wife. They reside in or near Eugene Oregon.  The Darlands together own 50 percent of the common shares of III, and they had managerial and supervisory roles at III.  On information and belief, they are also shareholders in Defendant Global Creative, Inc. ("GCI") and have substantially the same managerial and supervisory roles at GCI that they previously had at III.

3.        Defendant Takuma Takahara ("Takahara") is a director of III and owns approximately 25% of the shares of III.  He authorized various acts of III and signed the dissolution papers.  His residence is unknown at this time.  However, as a director of III—a company that was domiciled in Eugene Oregon—his actions had a direct effect in Eugene, and he is properly subject to the jurisdiction of this Court.  Together, Takahara and the Darlands exercised antagonistic control of III.

4.        Defendant GCI is an Oregon Corporation.  The Company's principal place of business is at 2645 Suzanne Way, Ste D, Eugene, OR, 97408.

5.        Defendant III is an Oregon Corporation that was improperly dissolved by antagonistic control of the defendant directors.  The Company's principal place of business was

at 2950 Chad Drive, Eugene, OR, 97408.  Until 2019, III was the exclusive distributor of TMP's

markers, including Copic brand markers. An Arbitration Award was issued by the International

Center for Dispute Resolution ("ICDR") against III on or around December 22, 2020 (the "ICDR

Award").  That arbitration award was confirmed and entered as a final judgment and money

award in favor of TMP and against III in the principal amount of $980,892.39 on or around June

17, 2021 (the "Judgment").  That Judgment can be found at Case No. 6:19-cv-00203-MK, in the

United States District Court for the District of Oregon, Eugene Division.

### Jurisdiction and Venue

6.      Jurisdiction is proper pursuant to 28 U.S.C. § 1332 *et seq.* because there is

diversity of citizenship and the amount in controversy is greater than $75,000.00.

7.      Venue is proper pursuant to 28 U.S.C. § 1391 because the Defendants are all

domiciled or have their principle place of business in Eugene, Oregon.

### Standing

8.      As a minority shareholder of III, TMP has standing to bring a derivative suit.

9.      TMP did not make a demand to the board prior to filing suit.  Such a demand

would be futile because the directors of III have antagonistic control and are directly responsible

for the improper and fraudulent conduct complained of here.

### Background

10.      This dispute arises out of a scheme that was designed and implemented by the

controlling directors so that they could defraud III's creditors and fraudulently convey all of the

physical assets, revenue streams, business opportunities, trade secrets and know-how of III

(Collectively the "Fraudulently Conveyed Property") first to themselves and then to Defendant

GCI, a corporation that they own and control.  If this Court does not take action, the Darlands

will be able to maintain control over and profit fully from the ongoing art supply business of III, which they fraudulently conveyed to themselves, while, at the same time, avoiding the ICDR Award against III, denying TMP any compensation for its shares in III, and defrauding any other legitimate creditors of III. The Darland's fraudulent transfer of III's profitable business to GCI was possible because they were shareholders and directors of III and because Takahara chose to collude with them in the transaction and in improperly dissolving III, through the antagonistic control of III.

11.     TMP makes and distributes markers. TMP's most famous brand is Copic. Copic markers are known worldwide for their high quality and for the wide variety of available colors.

12.     In 2018, III was the exclusive distributor of Copic markers (along with several of TMP's other branded art supply products) in the United States and Canada. This exclusivity was pursuant to an agreement with TMP.

13.     In or around June of 2018, TMP informed III that it would be terminating III's exclusivity, effective December 31, 2018.

14.     On information and belief, sometime in 2018 or 2019, III acquired the domain name markeruniverse.com and, using that domain name, created a web site that it used to distribute art supply products, including markers and other art supply products that compete with TMP's branded products.

15.     In February of 2019, III filed suit against TMP seeking $50,000,000.00 in damages and asserting causes of action for Close Corporation Proceedings, Breach of Fiduciary Duty, and Breach of Contract.

16.     That lawsuit, along with the counterclaims that were asserted by TMP, was resolved in TMP's favor in arbitration before the International Center for Dispute Resolution ("ICDR").

17.     TMP's counterclaims included breach of contract claims aimed at collecting all outstanding amounts due for the inventory that III had ordered and received from TMP.

18.     The Arbitrator ruled that III was in breach of contract and owed the full ¥344,284,954 yen called for in these invoices, with prejudgment interest. He converted that amount to dollars at the prevailing exchange rate on the date of the Award, which was ¥103.35 yen to the dollar. He then reduced this amount by subtracting (1) a stipulated amount due to III's return of unsold inventory to TMP, and (2) the amount he awarded on III's breach of contract claim. The resultant Award was in TMP's favor in the amount of $980,892.39 US plus post judgment interest at 9 percent per annum, which was reduced to Judgment as set forth above.

19.     Plaintiff's understanding of the Darlands' loan to III and of the assets fraudulently transferred pursuant to that loan is based on the limited information available at this time and will be supplemented in light of discovery and an audit of III's finances. In that regard, Plaintiff has made numerous attempts to understand the financial situation at III but has been thwarted because III has never permitted an audit and has provided only incomplete and misleading information about its finances.

20.     On information and belief, the Darlands provided a cash infusion (the "Infusion") to III allegedly in order to pay down a line of credit that III had taken from Summit Bank. This line of credit was secured by the inventory of TMP products that III had purchased. III relied on the bank's security interest to refuse to pay TMP the money that it owed.

21.     On information and belief, the Darlands intentionally structured the Infusion as a secured loan with the following plan: if there was a positive result for III in the arbitration and III won millions of dollars, the Darlands would be repaid at a profit, while, if III, didn't get the desired positive result, the Darlands could (and did) take possession and control of the Fraudulently Conveyed Property by "calling in" their "loan" and claiming that they had priority over all other creditors, especially TMP.

22.     The Infusion directly benefitted Defendant John Darland in the arbitration because, as the time of the Infusion, there were conversion claims pending against him. Specifically, TMP was asking the arbitrator to hold John Darland personally responsible for the full value of the converted inventory.

23.     The $1,265,595.45 loan that Darland provided to III, at a time when III is believed to have been insolvent or otherwise unable to pay its regular debts as they became due, permitted III to pay down its line of credit and return inventory to TMP, thereby reducing the amount of TMP's claim by a stipulated amount of ¥199,483,103 yen.  At the exchange rate used in the ICDR Award, to the extent that the Infusion was used to satisfy III's line of credit with the bank and thereby permit the return of inventory to TMP, it resulted in a $1,930,170.32 reduction of potential liability for Darland personally.

24.     The Darlands' improper loan was a material transaction that benefitted the Darlands, who were insiders and who used their insider position to the detriment of TMP and other creditors.   TMP was a minority shareholder and a secured creditor of III at the time that III entered into the loan transaction with the Darlands.  TMP is now both a minority shareholder and a judgment creditor whose UCC lien has merged into the judgment.  TMP was not timely informed of any board meeting relating to the decision for III to take the loan and never

approved of and does not approve of III structuring the Infusion as a secured loan that was intended to permit the Darlands to misappropriate the ongoing profitable business of III without compensating its major creditor, TMP.  Had TMP been properly and timely notified, TMP would have objected and/or sought rescission of the decision for III to enter the loan on the self-serving terms proposed by the Darlands.

25.    On or around December 22, 2020, the ICDR Award issued, granting TMP net damages in the amount of $980,892.39, including prejudgment interest at the rate of 9% per annum and with post-award interest running from December 22, 2020 at the same rate.

26.    On information and belief, in December of 2020, III was distributing at least the following branded arts supply products: Chameleon Art Products, Graph't, Karin, Krink, Kuretake, Sakura, Sketchmarker, Tombow, Terial Magic, Tommy Art, and Xpress-It.  On information and belief, these product lines generated around $1.6 million dollars in revenue in 2020 (on an accrual basis) and sales were on an upward trend.  The profitability of these product lines is not apparent from the accounting documents that III has produced to TMP, and TMP will have to conduct an audit to more accurately determine the full value of the Fraudulently Conveyed Property, which includes these revenue-generating product lines.

27.    On information and belief, GCI is currently distributing at least the same branded arts supply products: Chameleon Art Products, Graph't, Karin, Krink, Kuretake, Sakura, Sketchmarker, Tombow, Terial Magic, Tommy Art, and Xpress-It.  All of these business lines were intentionally and improperly transferred from III to GCI by the director defendants in such a way that the Darlands could maintain control over the profitable parts of III's business and thereafter profit themselves while avoiding existing obligations to creditors.

28.    On information and belief, on or around March 17, 2021, John and Hillary Darland "called the on demand note due", and thereby fraudulently conveyed the Fraudulently Conveyed Property of III to their new company, GCI.  In return for the Fraudulently Conveyed Property, the Darlands provided nothing of value to III other than "forgiving" three hundred thousand dollars of their own fraudulent or illusory debt.  In this way, unless the Court intervenes, the Darlands will have successfully placed the assets, opportunities and revenue streams of III's ongoing business beyond the reach of creditors while, at the same time, maintaining their own ability to profit from and control III's ongoing business without honoring TMP's rights as a shareholder or III's obligations to third party creditors.

29.    The decision to transfer the Fraudulently Conveyed Property to GCI was a material transaction that benefitted the Darlands, who were insiders and who used their insider position to the detriment of TMP both as a shareholder and as a creditor.  TMP was a minority shareholder and a secured creditor of III at the time that the Fraudulently Conveyed Property was fraudulently conveyed to GCI. TMP continues to be a minority shareholder and is now a judgment creditor.  TMP did not approve of the Infusion and never approved of and does not approve of the fraudulent conveyance or the dissolution and stripping of III's assets.

30.    On information and belief, III was dissolved on or around April 22, 2021, after the majority shareholders who had antagonistic control had approved the transfer of the Fraudulently Conveyed Property to GCI and after that transfer had occurred.

31.    On information and belief, III's board and majority shareholders made a deliberate decision not to comply with statutory law or Bylaws when dissolving III.  TMP was not properly informed of or consulted in connection with this decision.  Among other things, the Darlands and Takahara who, together were directors and controlled a majority of voting shares

of III made no effort to satisfy the ICDR Award. To the contrary, they conspired and took deliberate actions in violation of their fiduciary duties and in violation of the Bylaws and Articles of Incorporation of III to permit the Darlands to strip the ongoing profitable business and take it beyond the reach of priority creditors such as TMP.

32.    On information and belief, the Darlands held a secret board meeting and at that meeting with the support of board member and shareholder Takuma Takahara, III was dissolved without notifying or informing TMP, a minority shareholder.

33.    Because III was not properly dissolved by the majority shareholders, TMP first learned that III had been dissolved when it conducted a search of business records on file with the Oregon Secretary of State.

34.    On or around June 30, 2021, counsel for TMP wrote to counsel for III demanding an inspection of III's corporate records.

35.    On or around July 9, 2021, III produced several PDF files that purport to show its finances and the details of its decision to dissolve the company and transfer the company's assets and business opportunities to GCI. The effect and intent of the decision was to place the profits, assets and business opportunities outside the reach of TMP, a minority shareholder and judgment creditor, causing TMP to be unable to collect.

36.    The records that III has produced in response to TMP's request are incomplete and misleading. TMP continues to seek proper disclosure of the details of III's finances.

37.    The ICDR Award referenced in pleading paragraph 18 above was confirmed and converted to a judgment on June 17, 2021, Case No. 6:19-cv-00203-MK, in the United States District Court for the District of Oregon, Eugene Division (the "Judgment").

/ / /

**First Cause of Action (Against GCI)**

**Successor Liability/De Facto Merger/Mere Continuation**

38.    The allegations of Paragraphs 1 to 33 & 37 are incorporated herein by this reference as if fully set forth.

39.    Pursuant to the scheme described above, the Fraudulently Conveyed Property was transferred to GCI.

40.    TMP's claim against III was in existence at the time that the Fraudulently Conveyed Property was transferred to GCI.  The Darlands, who owned GCI, were fully aware of TMP's claim and priority security interest at the time of the transfer.  III has ceased doing business and was either insolvent at the time of the loan and the transfer or the loan and transfer rendered III insolvent.

41.    GCI is doing substantially the same business as III was doing in substantially the same manner with substantially the same management and in substantially the same location. The Darlands, who owned preferred and common shares of III and also managed the company, now own GCI.  The Darlands exercised control over III and now exercise control over GCI.  As such, there is continuity of ownership, management, personnel, location, assets, control and general business operations.

42.    GCI is a mere continuation of III and is liable as the successor to GCI pursuant to Oregon law under the doctrines of successor liability and/or de facto merger.

/ / /

/ / /

/ / /

/ /

## Second Cause of Action

### (Against GCI)

### Successor Liability on the Grounds of Fraudulent Transfer

43.     The allegations of Paragraphs 1 to 33 & 37 are incorporated herein by this reference as if fully set forth.

44.     Pursuant to the scheme described above, the Fraudulently Conveyed Property was transferred to GCI.

45.     GCI was formed for the purpose of receiving III's stripped assets, defrauding creditors and escaping liability, and was made with the actual intent to hinder, delay or defraud III's creditor TMP.  GCI was also formed with the actual intent to defraud III's shareholder TMP by removing the Fraudulently Conveyed Property from the control of III and placing it into GCI, a new corporate entity that the Darlands hoped would be beyond the reach of III's creditors.

46.     The transfer of all of the Fraudulently Conveyed Property to GCI was arranged by the Darlands who were insiders.  To the extent that the transfer was approved by the board of III, that board consisted of the Darlands and Takahara who acted illegally, with antagonistic control, and without notifying or obtaining the consent of TMP, a minority shareholder.

47.     The full value of the Fraudulently Conveyed Property is unknown at this time as III has not provided information sufficient to conduct a full audit of its finances.  However, on information and belief the transfer to GCI was for less than the reasonably equivalent value of the Fraudulently Conveyed Property.

48.     The transfer occurred soon after III received the adverse ruling in the arbitration and before entry of Judgment.

49.     During the Arbitration, the Darlands fraudulently entered into a loan arrangement with III whereby, in the event that it lost the arbitration, all of the assets, opportunities and revenue streams of III would be stripped and placed beyond the reach of creditors and under the control of the Darlands who would then be able to continue the business without meeting the debts and obligations of the company.

50.     Because the Darlands own and control GCI, GCI took III's assets and business with full notice of the fraudulent nature of the transaction.

51.     Therefore, under the doctrine of successor liability, the Court should order that GCI, having purchased or otherwise received the assets of III, is also liable for the debts of III under the doctrine of successor liability.

**Third Cause of Action**

**(Against the Darlands)**

**Alter Ego Liability**

52.     The allegations of Paragraphs 1 to 33 & 37 are incorporated herein by this reference as if fully set forth.

53.     The Darlands have operated III and GCI for their own personal benefit at the expense of third party creditors.

54.     The Darlands, who had managerial control over III, deliberately kept the company grossly undercapitalized, running it on a line of credit that was extremely large given the limited assets of the company.

55.     The Darlands further milked III by paying dividends to preferred shareholders and thereby depleting cash, which permitted them to run the company using line of credit debt

without maintaining sufficient cash in the company to operate in the event that they were required to pay for the inventory that they received from TMP.

56.     The Darlands further manipulated III through a fraudulent conveyance.  On information and belief, the Darlands, acting as litigation financiers, "invested" $1,265,595.45 US into III in the hopes of personally profiting from the arbitration against TMP.  The Darlands deliberately structured their "investment" as a loan with the intent that, in the event that III did not receive a positive result in the arbitration, they could and would take the Fraudulently Conveyed Property outside the reach of creditors and into their own hands.  Takahara colluded with them in this fraud through the exercise of antagonistic control of III. When III lost the arbitration, the Darlands actually did take the Fraudulently Conveyed Property outside the reach of creditors and transferred it to defendant GCI.  In doing so they "forgave" $300,000.00 of the supposed debt, and, thereby, obtained the Fraudulently Conveyed Property for less than its fair value.

57.     By making this loan, the Darlands also reduced their own potential personal liability in that, at the time that they made the loan, there was a conversion claim against John Darland personally for the full amount of unpaid invoices from TMP on the grounds that he personally authorized the conversion of the funds that III received from selling inventory that it purchased from TMP in violation of TMP's recorded UCC security lien.

58.     The Darlands actions as managers of III were in breach of their fiduciary duties to the shareholders of the company, and this should weigh in favor of a finding of alter ego liability. In that regard, the Darlands, intentionally, deliberately, and in breach of their fiduciary duties, used the corporate form as a vehicle to speculate on litigation while limiting their own financial risk at the expense of the corporation and its shareholders including minority shareholder TMP.

59.     In addition, the Darlands, intentionally, deliberately, and in breach of their fiduciary duties, used the corporate form to fraudulently convey its assets and business to a new company, Defendant GCI, which, on information and belief, is owned and controlled by the Darlands.  This is an unjust and fraudulent use of the corporate form in derogation of the interests of TMP as a minority shareholder and in derogation of TMP's interest as a secured, then judgment, creditor.

60.     Further, the Darlands, intentionally, deliberately, and in breach of their fiduciary duties, usurped all of the outstanding corporate opportunities of III and took those opportunities to GCI when they started GCI.

61.     Further, the Darlands, intentionally, deliberately, and in breach of their fiduciary duties, chose not to follow the legal formalities associated with dissolution of a company, which effectively allows them to complete the transfer, strip the assets and opportunities, and dissolve III in secret and haste.  Such failure to follow corporate formalities weighs in favor of a finding of alter ego liability.

62.     The Darlands intermingled their personal funds in the funds of III by "lending" money to III in order to speculate on arbitration and structuring the loan so that they could transfer all of the assets, opportunities and revenues streams of the business into their own sole control and outside the reach of III's other creditors.

63.     The Darlands, having defrauded the creditors of III and, in addition, defrauded TMP, a minority shareholder, by fraudulently conveying the Fraudulently Conveyed Property to themselves, should be held personally liable for at least the full amount of TMP's judgment under the alter ego doctrine.

/ / /

**Fourth Cause of Action**

**(Derivative Action Against III, the Darlands and Takahara)**

**Breach of Fiduciary Duty**

64.    The allegations of Paragraphs 1 to 33 & 37 are incorporated herein by this reference as if fully set forth.

65.    The Darlands and Takahara as directors of III had a fiduciary duty to III to comply with corporate formalities, to operate their company lawfully, and in accordance with its bylaws, and not to defraud their minority shareholders or creditors.

66.    The Darlands and Takahara as directors of III dissolved III without complying with the laws or Bylaws that are required in order to dissolve a company legally.

67.    Prior to dissolving the company, the Darlands, with the cooperation of Takahara, fraudulently encumbered and then conveyed the Fraudulently Conveyed Property to GCI with the intent to place that property in the hands of the Darlands and beyond the reach of III's creditors. These actions were all in breach of their fiduciary duty as directors to III.

68.    These breaches of fiduciary duty comprised antagonistic control and were the proximate cause of harm to III and its minority shareholder TMP, in addition, caused unjust enrichment to the controlling directors of III and GCI in an amount to be determined at trial.

69.    TMP was a shareholder of III at the time that these breaches of fiduciary duty occurred.

70.    These breaches of fiduciary duty, having been committed willfully, intentionally, deliberately, and in breach of contractual obligations and fiduciary duties by the directors of III, it would be futile to demand that the board of III correct their misconduct and, therefore, TMP is

asserting III's rights pursuant to ORS 60.261 in a derivative action seeking relief from the above misconduct of III's directors.

**Fifth Cause of Action**

**(Derivative Action Against III, the Darlands and Takahara)**

**Breach of Contract**

71.      The allegations of Paragraphs 1 to 33 & 37 are incorporated herein by this reference as if fully set forth.

72.      The Darlands and Takahara, as directors of III, are parties to the Articles of Incorporation and Bylaws of III.  Each of these documents constitute binding contracts between each of these individual defendants and III.

73.      The conduct of each of these individual defendants were in breach of the Bylaws and Articles of Incorporation of III in that the at least the following decisions were not properly authorized in accordance with the Bylaws and Articles of Incorporation of III: (1) the decision not to accept a non-exclusive distributor agreement with TMP, (2) the decision to file a lawsuit against TMP alleging $50,000,000.00 in damages, (3) the decision to borrow money from the Darlands on the terms that they demanded in order to be able to return the inventory and at a time III, on information and belief, was otherwise undercapitalized, insolvent or otherwise unable to pay its regular debts as they came due, (4) the decision to strip and fraudulently convey the Fraudulently Conveyed Property to the Darlands pursuant to the improper loan that III entered into with the Darlands, and (5) the decision to dissolve III without complying with the formal legal procedures that are required when dissolving a company.

/ / /

/ /

74.     These breaches of contract were the proximate cause of harm to III and its shareholder TMP, in addition, caused unjust enrichment to the Darlands, Takahara and/or GCI in an amount to be determined at trial.

75.     TMP was a shareholder of III at the time that these breaches of contract occurred.

76.     These breaches of contract, having been committed intentionally, deliberately, and in breach of their contractual obligations and fiduciary duties by the directors of III, it would be futile to demand that they correct their misconduct and, therefore, TMP is asserting III's rights in a derivative action pursuant to ORS 60.261 seeking relief from the above misconduct and antagonistic control of III's directors.

**Sixth Cause of Action**

**(Derivative Action Against III, the Darlands and Takahara)**

**Conversion**

77.     The allegations of Paragraphs 1 to 33 & 37 are incorporated herein by this reference as if fully set forth.

78.     The Darlands and Takahara, as directors of III, improperly authorized the fraudulent conveyance of the Fraudulently Conveyed Property.

79.     Through the fraudulent conveyance the Darlands converted the Fraudulently Conveyed Property to their own ownership and use.

80.     By engaging in antagonistic control with the Darlands and authorizing the fraudulent conveyance as a board member, Takahara participated in the conversion.

81.     This conversion, having been committed intentionally and deliberately by director defendants for their own benefit, it would be futile to demand that they correct their misconduct.

Therefore, TMP is asserting III's rights in a derivative action pursuant to ORS 60.261 seeking relief from the above misconduct of III's directors.

## Seventh Cause of Action

### (Derivative Action Against III, the Darlands and Takahara)

### Equitable Accounting

82.     The allegations of Paragraphs 1 to 37 are incorporated herein by this reference as if fully set forth.

83.     Because of the relationship between the parties, Plaintiff's legal remedies are not adequate.

84.     Because III has not provided information in sufficient detail to permit a rigorous financial audit, the amount due to Plaintiff is uncertain and cannot be ascertained without an accounting, since the information necessary to determine that amount is within the exclusive knowledge of Defendants.

## Eighth Cause of Action

### (TMP Against the Darlands and Takahara)

### Creditor's Bill

85.     The allegations of Paragraphs 1 to 33 & 37 are incorporated herein by this reference as if fully set forth.

86.     TMP is a judgment creditor of III that, at all relevant times prior to becoming a judgment creditor held a perfected security interest in the proceeds the sales of all inventory that III ordered but did not pay for.

/ / /

/ /

87.    The Darlands and Takahara fraudulently stripped III of all of the Fraudulently Conveyed Property and took away the ability of the company to generate profits that could be used to satisfy the judgment.

88.    The remedies at law are insufficient to compensate TMP for its loss and, therefore, TMP is entitled to the full range of equitable remedies within the power of the Court.

* * * * *

Now therefore, Plaintiff prays for the following relief:

A.    An order declaring that Defendant GCI is the successor of III and, as successor is liable for all legitimate debts of III, in a sum not less than the Judgment;

B.    An order declaring that the Darlands are fully liable for the debts of III on an alter ego theory of liability, in a sum not less than the Judgment;

C.    An order declaring that the Darlands and Takahara breached their fiduciary duties by fraudulently and usurping control over and converting all of the assets, opportunities and revenue streams of III with the intent to illegally place those assets, opportunities and revenue streams beyond the reach of creditors, causing III damage and causing TMP to be unable to collect its Judgment;

D.    An order declaring that the Darlands and Takahara were unjustly enriched by their fraudulent conduct and disgorging all such enrichment, in a sum not less than the Judgment;

E.    An order declaring that the loan from the Darlands to III was an illusory and/or fraudulent transaction, along with an order voiding that loan, and impounding the loan proceeds to the Clerk of the Court, first paying the proceeds to the court cost of the impoundment, second paying the proceeds to Plaintiff in full or partial satisfaction of

the Judgment together with post judgment interest at the statutory rate together with reasonable attorney fees and costs for collection and enforcement; and third paying any net proceeds pursuant to further order of the Court;

F.  Awarding further money damages to TMP against the Darlands, Takahara and GCI, and each of them, jointly and severally, in the full value of the Fraudulently Conveyed Property together with reasonable costs of collection and enforcement together with post-judgment interest;

G.  An order declaring the Judgment attaches to and may be levied and executed against the assets fraudulently transferred or the proceeds thereof, against the Darlands, Takahara, and GCI, and each of them, jointly and severally, in the full amount of the Fraudulently Conveyed Property together with post-Judgment interest;

H.  Awarding plaintiff's reasonable attorney fees and costs pursuant to contract, ORS 95.260(1)(c)(C), and/or common law, in an amount and manner to be determined in accordance with FRPC 54(d)(2);

I.  An order disgorging all unjust enrichment of defendants in full or partial satisfaction of Judgment;

J.  An award of lost profits to the extent of GCI's gain, in full or partial satisfaction of the Judgment;

K.  A constructive trust on the assets and inventory of the Darlands and GCI to the extent of their illicit gain, in full or partial satisfaction of the Judgment; and,

/ / /

/ / /

/ /

L.  Such additional relief as the Court deems appropriate.

Dated: July 29, 2021                                    BLACKWELL LAW, P.C.

Michelle A. Blackwell, OSB#002070
mblackwell@blackwell.law
747 Blair Blvd.
PO Box 10326
Eugene, OR 97440
(541) 345-8800
Of Attorneys for Plaintiff Kabushiki Kaisha Too
Marker Products