IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KABUSHIKI KAISHA TOO MARKER PRODUCTS, INC., a Japanese Corporation, | |
| Plaintiff, | Case No. 6:21-cv-01115-MC |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| GLOBAL CREATIVE, INC., an Oregon Corporation, JOHN DARLAND, an individual, HILLARY DARLAND, an individual, and IMAGINATION INTERNATIONAL, INC., an improperly dissolved Oregon Corporation | |
| Defendants. | |
| GLOBAL CREATIVE, INC., an Oregon Corporation, JOHN DARLAND, an individual, HILLARY DARLAND, an individual, and IMAGINATION INTERNATIONAL, INC., an improperly dissolved Oregon Corporation, | |
| Counterclaim Plaintiffs | |
| v. | |
| KABUSHIKI KAISHA TOO MARKER PRODUCTS, INC., a Japanese Corporation | |
| Counterclaim Defendants. | |

1 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

MCSHANE, Judge:

On January 4, 2024, the Court held a two-day bench trial in this dispute between Kaisha Too Marker Products, Inc. ("TMP") and Defendants Global Creative, Inc. ("CGI"), John and Hillary Darland ("Darlands"), and Imagination International, Inc. ("III"). Testimony was primarily provided by Defendant Mr. Darland, who was called and cross-examined by both parties. An exhaustive list of exhibits was received and reviewed. Upon close of Plaintiff's case, the court directed a verdict in favor of the defense on Plaintiff's third claim for relief relating to the transaction between Defendant III and Upward Spiral Technologies, LLC ("Upward Spiral"). The Court granted Plaintiff's motion to dismiss its creditor's bill claim. Plaintiff's remaining claims are whether the transfer of assets from III meet the elements of successor liability or fraudulent transfer under Oregon law. The Court concludes that neither theory succeeds. JUDGEMENT for the Defendants. Defendants counterclaim for sanctions against Plaintiff is DENIED.

## BACKGROUND

III is a dissolved Oregon Corporation that was primarily in the marker distribution business. In 1998, shortly after its creation, it entered into an exclusive agreement with TMP, a Japanese Corporation, to develop a domestic American market for felt markers. Pl.'s Second Am. Compl. at 2, ECF No. 60 ("SAC"). The partnership was successful and, in 2008, TMP took ownership of common stock in III. *Id.* However, following a change in leadership in June of 2018, TMP informed III that it would be terminating the exclusive distributorship agreement ("DA") with III at the end of the calendar year. *Id.* at 4. The following timeline documents relevant facts that gave rise to this dispute.

2 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

In 2018, III was the exclusive distributor of TMP's Copic products. Trial Transcript Day 1 ("TT1") at 12. At this time, Mr. Darland was still the president and CEO of III, and he was also a shareholder and on the board of III, along with his wife, Hillary Darland. TT1 at 12-13. TMP was also a shareholder at this time. Takuma Takahara and Eiichi Ishii of TMP were on the board. TT1 at 12-13. At the time III was informed of the termination of the DA, distributing Copic markers constituted roughly 95% percent of its sales. TT1 at 66.

In February of 2019, III sued TMP over a disagreement about the terms of the distributorship agreement. TT1 at 14. III, at that time, believed that it still had exclusive right to sell Copic inventory for the first three months of 2019, pursuant to the DA. Opp. to Def.'s Mot. for Summ. J. and Sanctions at 7. Despite III's belief that it alone had exclusive right during this period, TMP began selling Copic markers in February. *Id.* The case was initially filed in federal court and then moved to arbitration. *Id.* At the end of March 2019, III continued to sell Copic markers. This led TMP to seek and receive an emergency injunction against III to prevent any further sales.

On November 20, 2020, the Darlands made a secured loan for $1,265,595.45 to III. TT1 at 28. Next, the parties entered into a stipulation in which III would return inventory to TMP for a credit of 199,483,103 yen, or $1,930,170.32. Opp. to Def.'s Mot. for Summ. J. and Sanctions at 9. On December 22, 2020, the Arbitrator ruled that III had breached the contract with TMP and awarded a judgment for TMP, which was reduced by the amount of the stipulation. SAC at 6. On December 28, 2020, Mr. Darland recorded a security interest in the loan that was made to III. TT1 at 39.

On February 22, 2021, III sold the IP and inventory of certain light-emitting diode (LED) technology to Upward Spiral Technologies, LLC ("Upward Spiral") for $25,000. TT1 at 43-44.

3 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

On March 17, 2021, the Board of III, which consisted of the Darlands and Takuma Takahara, decided to dissolve the company. Papers were filed with the Secretary of State on April 2, 2021. TT1 at 53; TT1 at 60. On April 6, 2021, the Darlands formed CGI. TT1 at 60. On April 27, 2021, the Darlands entered into a Collateral Surrender Agreement ("CSA") with III. TT at 61. Pursuant to the CSA, certain assets of III were given to the Darlands in the return for $300,000 in forgiveness for the loan that had been provided to III in November of 2020. Opp. to Def.'s Mot. for Summ. J. and Sanctions at 10. The Darlands then sold the $300,000 in assets to CGI. TT1 at 62. In June of 2021, Plaintiffs filed this suit.

## FACTUAL FINDINGS

### I.     Successor Liability

The parties dispute the similarity between III and GCI as business enterprises. Plaintiff maintained that GCI is merely a continuation of III, its predecessor corporation. Testimony at trial primarily concerned the business overlap of Olo Marker and the inventory that CGI obtained as a result of the collateral surrender agreement.

#### a.  Development of Olo Marker

At trial, a considerable amount of testimony focused on whether, and to what degree, Mr. Darland was developing Olo Marker while at III. It is undisputed that in November of 2018, Mr. Darland formed Kazoku, Inc. In February of 2019, Mr. Darland registered the domain names markeruniverse.com and olomarker.com, with Kazoku holding the trademark. TT1 at 14. These developments occurred prior to the preliminary injunction from the arbitrator in May of 2019, prior to the loan in November of 2020, and prior the dissolution of TMP and creation of CGI in early 2021. Plaintiff contends that Olo Marker was developed at III and therefore constituted a significant market opportunity that was transferred to CGI. TT1 at 126.

Plaintiff presented evidence that Olo Marker prototypes were sent to Mr. Darland while Mr. Darland was working at III, concluding that such an action established that Olo Marker was in its development cycle at III. Counsel for Plaintiff quoted deposition testimony from Mr. Darland in which Mr. Darland stated that "he thinks" and "he believes" that III received prototypes prior to dissolution of III. TT1 at. 20. On the stand, Mr. Darland responded that the products sent to him from Japanese companies were better characterized as "examples of technology from potential suppliers in Japan." TT1 20-21. Continuing, Mr. Darland stated that Olo Marker was just an "idea" and a "concept" at that point, and because it had not yet been designed, no prototype could have been sent. TT1 at 21. Later in testimony, Mr. Darland stated that prototypes were received in March of 2022, at which point he had paid for "molds." Trial Testimony Day 2 ("TT2") at 32. Mr. Darland stated that he didn't have an agreement with the technology provider, Hori, until April or May of 2022, more than a year after GCI was created. *Id*. CGI began taking pre-orders for Olo Marker in January of 2022. *Id*. Mr. Darland testified that, currently, Olo Marker constitutes roughly 50-60 percent of sales and "97 percent of everything we do is to promote Olo Marker." TT1 at 69.

I find Mr. Darland's explanation here to be credible. Plaintiff offered little evidence to dispute Mr. Darland's account that the marker had not been designed at III and that prototypes were first sent in March of 2022 to CGI. While the examples that were sent to III contained technology that was eventually used in the Olo Marker (the Hori Technology), this is consistent with the account that Olo Marker had not yet been designed at III. Insofar as Olo Marker was in development at III, it consisted of the examples that were sent to Mr. Darland and his discussion with colleagues at III about what kind of product he was "going to develop." TT1 at 18.

    b. **Sale of Inventory**

5 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

While the parties vigorously dispute whether the degree in overlap of III and CGI amounts to successor liability, it became clear at trial that the underlying facts are less at issue. At that time of III's dissolution, the Chameleon marker was its largest product line, representing over 50% of its sales. Def's Closing at 3; TT2 at 8. This was a competitor product to TMP's Copic, which III was prohibited from selling prior the dissolution of the DA with TMP. TT2 at 12. III was also selling a range of other markers. According to Mr. Darland, and undisputed by Mr. Makman, Mr. Darland received a "couple of boxes" of Chameleon as part of the collateral surrender agreement, but nearly all of the inventory was returned to Chameleon, and this business relationship was not continued at CGI. TT2 at 9. Mr. Darland testified that the total inventory that was transferred as part of the collateral surrender agreement represented about 30 percent of the inventory that was left at dissolution, which amounted to roughly 10 percent of sales, because most of the sales came from Chameleon. TT2 at 12. The Plaintiff did not dispute this characterization, and I find it to be credible.

Turning to CGI's business, which began in 2021 as III was winding up, Mr. Darland testified that, in addition to the Chameleon inventory, CGI sold a number of other markers that had been transferred in the CSA: Graph-it, Krink, Tombow, Karine, Ketchmarker, Terial, Tommy, X-Press It, Sakura, and Newpen. TT1 at 81. These were the markers that Mr. Darland received as inventory from III in the collateral sale agreement. According to Mr. Darland, this was "leftover" inventory that generated some cash for him when starting the business. TT2 at 14. Mr. Darland testified that he renegotiated three or four of those contracts, which currently constitute up to 30 or 40 percent of the company. TT1 at 67. However, most of those markers were no longer sold. *Id*. It was not until January of 2022 that CGI took orders of Olo Markers, and CGI didn't actually have the product until July of 2022. TT1 at 82.

6 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Mr. Darland's account largely aligns with the Plaintiff's expert witness, Monica Ip. Ms. Ip analyzed the overlap in sales between III and the first year of GCI operations. She found that a "a significant portion of GCI's sales were made to customers that were previously customers of III." She concluded that, in the first year, "a majority of GCI's sales were generated from products that were previously sold by III." *Id.* I find this analysis generally credible, insofar as it shows significant overlap in customers in the first year of business at CGI.

In addition to markers, Mr. Darland received equipment, such as chairs and desks, that were used at CGI. TT1 at 66. Mr. Darland also sold Everyday Easel at III. Darland did not dispute that Everyday Easel was listed on the website for CGI, but he explained that it was listed on the website as having zero inventory because the remaining inventory that he had gotten in the CSA was defective. TT1 at 74. He ended up giving most of it away. TT1 at 67. I also find Mr. Darland's testimony relating to Everyday Easel to be credible.

## II.     Fraudulent Transfer

The second set of facts at issue is the secured loan made by the Darlands to III and the subsequent collateral surrender agreement (CSA) that provided for the transfer of assets from III to the Darlands. Plaintiff alleges that the loan was part of a fraudulent scheme by the Darlands to avoid an adverse judgment by the arbitrator. I make the following factual findings.

### a.   Disclosure of Secured Loan and Collateral Surrender Agreement

At trial, the parties disputed the transparency of the secured loan that the Darlands provided to III. TT2 at 61. In questioning Mr. Darland, Plaintiff attempted to show that the loan was concealed because it was not on the balance sheet in 2022. TT1 at 43. Mr. Darland explained, however, that this was a retroactive revision of the loan, and that more contemporaneous balance sheets included it. TT1 at 43. After conferring, the parties stipulated

7 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

the balance on December 31, 2020, did include the secured loan, and that this balance sheet was produced to the Plaintiff on April 21, 2022. TT2 at 6.

Next, Plaintiff emphasized that the secured loan was not discussed in the arbitration stipulation agreement on October 27, 2020, which provided for the return of III inventory to TMP. TT2 at 62; TMP's Post Trial Brief at 14. Mr. Darland, in response, stated that there was no obligation for the nature of the loan to be referenced on the CSA. TT2 at 63. Further, Mr. Darland stated that Plaintiff "knew there was a loan happening" because Chris Helmer, the lawyer for III, communicated this via email in arbitration." TT2 at 62. Plaintiff did not dispute this awareness at trial, instead focusing on the fact that the loan was not in the arbitration agreement. I find that TMP was aware of the loan.

Plaintiff also argues that the loan was concealed because, if it was made known to the Plaintiff in arbitration, there was no mention of it being *secured*. TT2 at 63. Mr. Darland testified that there was nothing deliberate in his failure to communicate the nature of the loan; he testified that was merely following the advice of his lawyer in securing the loan. TT2 at 61. I find that there was no evidence that Mr. Darland intentionally concealed the fact that the loan was secured. I also find that it would have been reasonable for TMP to assume that a personal loan of this value would be secured. I find credible Mr. Darland's testimony that he was following the advice of his attorney in securing that the loan and not attempting to perpetuate a fraud. TT1 at 65.

    b. **Value of the Transfer**

The parties dispute the value of the secured loan that Mr. Darland provided to and collected from III. Plaintiff contends that the value received far exceeded the $1.2 million loan that the Darlands provided to III. This excess value, Plaintiff claims, is the sum of the Upward

8 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Spiral Transaction, the $2.5 million dollar customer list, the markeruniverse.com domain name website, the design patent of Everyday Easel, and all of III's receivables and purchase orders that had issued to III but were transferred to and filled at CGI. TMP's Trial Memo at 11.

With respect to the customer lists, the dispute at trial centered on a distinction between customer "lists" and customer "information." At trial, counsel for Plaintiff read Mr. Darland's testimony from the arbitration in which Mr. Darland discussed the value of the customer information, which he had placed at $2.5 million in III's initial lawsuit against TMP. TT1 at 109.

> My belief as the owner of the business of what I would have been willing to sell Imagination's customer information for an arm's-length transaction, as set forth in paragraph 48 of Darland's first witness statement, was a minimum of $2.5 million.

TT1 at 109. As Mr. Darland quickly noted, this quote referencing $2.5 million referred to customer "information," not "lists." *Id.* Mr. Darland went on the describe the distinction between the two. TT1 at 110-111. He explained that there were no customer lists in existence at the time; the asset he was referencing was information about customers, such as "[h]ow much they bought from us, when they bought from us, what kind of inventory they bought from us, who the contacts were." TT1 at110. Further, Mr. Darland testified that the customer list was published on the III website, and they are currently on TMP's Copic website. *Id.* I find Mr. Darland's testimony to be credible that there is a distinction between the customer lists and the customer information. Mr. Darland not only referred to customer "information" when describing that $2.5 million valuation in his lawsuit; he also noted that the information was on the website and open to the public. TT1 at 110. There is no indication that an independent customer list existed as an asset of III that was obtained and transferred by Mr. Darland.

Concerning the Upward Spiral transaction, as I ruled by directed verdict at trial, I find Mr. Darland's testimony of the sale to be credible and without sufficient rebuttal from Plaintiff.

9 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

TT1 at 170. Despite Plaintiff's assertion, there is no evidence that the Upward Spiral sale was an insider transaction. It was made by Mr. Darland to a third party. TT1 at 164. Further, as I ruled, the value of the sale was reasonable.

With respect to the Marker Universe domain name, Mr. Darland testified that it was transferred as part of the Collateral Surrender Agreement. TT1 at 72. Mr. Makman inquired about why Mr. Darland did not list the domain name in Exhibit A of the CSA as an individual item transferred. TT1 at 70. Mr. Darland explained that Exhibit A is not an exhaustive list of everything transferred. TT1 at 72. I find this to be correct: the CSA states applies to "all business assets, accounts receivable…customer lists, and other assets of every kind and nature, without exception, including those assets described in exhibit A attached hereto." Plaintiff Exhibit 20. Further, the domain name appears to have been of little value. It was only used at the beginning of CGI operations when Mr. Darland was selling off the inventory that he received from III. TT1 at 85. Today, as he testified, the website doesn't exist. TT1 at 84. I find that the absence of the domain name in the Exhibit does not suggest the domain was concealed, and I find that the value of this transfer is domain name was of minimal value, within the $300,000 received by the Darlands.

Plaintiff further identifies the Everyday Easel product as an asset that was transferred but not accounted for. As with Marker Universe, it is true that Everyday Easel was not listed in the non-exhaustive Exhibit A, but it was neither required to be listed, nor does it appear to be worth very much. As noted above, Mr. Darland does not dispute that Everyday Easel was listed on the website for CGI, but he explained at trial that it was listed as having zero inventory because the inventory he received in the CSA was defective and was ultimately donated. TT1 at 67. Plaintiff

10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

has not shown facts beyond a preponderance that the value of Everyday Easel is so high as to invalidate Mr. Darlands estimated of costs.

Finally, Plaintiff contends that there were accounts receivable and outstanding purchase orders that were transferred to CGI, adding greater value to the transfer. Mr. Darland, in testimony, stated that all the accounts received were used to pay the debts to the company. TT2 at 11. He stressed that accounts receivable were still coming in at the time of the CSA, which was April 27, 2021. Plaintiffs argue by inference that, because there were accounts receivable collected after April 2, 2021, Mr. Darland took them. But this timeline of events presented by Plaintiff is consistent with Mr. Darland's explanation that the accounts receivable were still put towards III to wind up the company. TT1 at 28. With respect to purchase orders, Mr. Darland does not dispute that a number of those orders were carried over to CGI. TT1 at 66. Mr. Darland noted at trial that he reached out to previous III customers to discuss doing business at CGI.

## CONCLUSIONS OF LAW

After the directed verdict on the third and fifth causes of action, the Court is left to rule on Plaintiff's first, second, and fourth claims. I find, for the following reasons, that Plaintiff fails on all three. I defer judgment on Defendants counterclaims to give the parties time to re-assess their positions after today's findings of fact and conclusions of law.

### I.   Successor Liability on Grounds of Mere Continuation

Plaintiff does not succeed on its claim of successor liability on the basis of mere continuation. In Oregon, the "general rule" for successor liability is that "where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor." *Erickson v. Grande Ronde Lumber Co.,* 162 Or. 556 (1939). However, the *Erickson* Court set out four exceptions:

11 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

> To this general rule there are four well recognized exceptions, under which the purchasing corporation becomes liable for the debts and liabilities of the selling corporation. (1) Where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporations; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts.

*Id.* at 568 (quoting *West Texas Ref. & Dev. Co. v. Commissioner*, 68 F.2d 77 (10th Cir.1933)).

Under the mere continuation theory, successor liability exists if the successor corporation is "substantially the same" as the predecessor corporatization "despite a business transformation." *Alicki v. Intratec USA, Inc.*, 769 F. Supp. 336, 340 (D. Or. 1991). Under this exception, the theory is that a corporation that undergoes a "mere change of *form* without substantial change in *substance* … should not be allowed to thereby avoid liability." *Estey & Assocs., Inc. v. McCulloch Corp.,* 663 F.Supp. 167, 171 (D.Or.1986). What the successor corporation "accomplishes is something in the nature of a corporate reorganization, rather than a mere sale." *Id.* (quoting *Groover v. West Coast Shipping Co., Inc.,* 479 F.Supp. 950, 951 (S.D.N.Y.1979)).

Here, GCI is not a "mere continuation" of III because the two businesses are not substantially the same. Put simply, III was a marker distributor, whereas CGI was founded to be a marker manufacturer. Until the DA was terminated in 2018, roughly 95 percent of sales from III were from distributing Plaintiff's Copic marker. TT1 at 66. After the DA was terminated, Mr. Darland scrambled to make the company profitable by distributing other products, but he was never successful. TT2 at 9. The formation of GCI was a different business: it would manufacture its own marker. TMP, which was a shareholder of III, would not have permitted, much less supported, the development of a competitor marker at III.

12 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff's argument of mere continuation hinges on a few elements of similarity between III and CGI. First, Plaintiff stresses the overlap of shareholders, officers, and directors between the two companies—namely, the Darlands. While this is suggestive of successor liability under mere continuation, it is not dispositive. The critical context is that, while the Darlands continued ownership, III did not. And this is for good reason: again, the purpose of CGI was to create a new marker, potentially as a competitor to TMP. In addition to this distinction in ownership, III was a C corporation with four common shareholders, whereas CGI was an S corporation with two common shareholders. Def.'s Closing at 4. The businesses had different locations, and they were significantly different sizes. *Id.* III, prior to the termination of the DA in 2018, had roughly 100 employees, while CGI has approximately eight. *Id.*

There is also insufficient overlap in the nature of the companies to find successor liability under the mere continuation theory. Plaintiff focuses myopically on the initial months of CGI, before Olo Marker was designed and ready to be sold. Ms. Ips, Plaintiff expert, only examined the first year of operation, which is prior to the launch of Olo Marker and when CGI was selling inventory that had been obtained from III in the CSA. Indeed, during that initial stage of operation, the business appeared to have significant overlap with what was sold at III. However, as with similarity in ownership, larger context is critical. In *Alicki*, this Court declined to find sufficient continuity between two gun manufacturing companies, even though the new company sold a "nearly identical" handgun gun and employed a handful of the same employees. 769 F. Supp. at 341. Critically, the new company "expanded the business," had a new location, and had new owners and managers (the son of the prior company).

It would be an understatement to say that CGI "expanded the business." While there was overlap in products sold by both entities, it was for the most part, temporary. TT2 at 14. Mr.

13 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Darland did not continue to engage in the distributions of those products after that inventory was sold. Rather, he focused on producing and selling Olo Marker as the core of the business. *Id.* Credible testimony also revealed that there were no sales of Everyday Easel and that all accounts receivable went to winding up the business at III. As Mr. Darland acknowledges, contracts with former customers of III were renegotiated at CGI, but this does not prove continuation of the business. As Mr. Darland testified, the market for marker distribution is small; it is reasonable that Mr. Darland would be in discussions with the same customers when engaging in marker distribution at CGI. Further, while CGI initially sold many of the products that were sold at III, this does not show that the primary business at III was continued at GCI. This is why Ms. Ip's testimony can be credited without concluding that there was sufficient continuation. Most importantly, the Chameleon marker was the primary business of III since 2018, but it was not continued at CGI in any substantial manner. TT2 at 9.

With respect to Olo Marker, the facts indicate that any overlap in development is insufficient to conclude that Olo Marker was "continued" at CGI. As noted in the factual finding, Plaintiff did not make a sufficient showing that Olo Marker was being manufactured, designed, or marketed at III. Plaintiff relied almost exclusively on deposition from Mr. Darland in which he stated that he "believed" that the prototypes had been send to III. However, I found Mr. Darland's clarification at trial to be credible, in which he explained that these were examples of marker technology sent to III and that Olo Marker, specifically, had not yet been designed. TT1 at 21. In addition, the Olo Marker domain name was registered to Kazoku, a different company than III that been personally formed by Mr. Darland. TT1 at 11.

Finally, I give weight to the fact that III was an *entirely* different business than CGI for most of its existence, prior to the termination of the DA in 2018. Plaintiff, in its closing brief,

14 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

brings in case law from federal common law to argue that the mere continuity test should focus on whether there was substantial continuity in operations at the precise time of change in ownership. TMP's Post Trial Brief at 24 and 25. But the test in Oregon, not federal common law, is whether the companies are substantially the same, and whether the successor company amounted to a mere corporate reorganization. As applied here, I decline to look solely at the overlap in the business at the time of change in ownership, and I find it significant that the business at III was, until 2018, the distribution of TMP's product up until Plaintiff's terminated that arrangement.

I conclude that III and CGI were not substantially the same business, and therefore, CGI is not a successor under the mere continuation theory.

## II. Fraudulent Transfer

Plaintiff's alternative theory for successor liability, as well as its claims for fraudulent transfer under Oregon statute, turn on whether the secured loan that was given to III by Mr. Darland was fraudulent. Because I do not find that there was sufficient badges of fraud or constructive fraud, I find that the secured loan was not fraudulent.

### i. Fraudulent Transfer

Under Oregon statue, claims of fraudulent transfer are governed by the Uniform Fraudulent Transfer Act (UFTA). ORS 95.200 *et seq.* Under this statute, there are two ways to prove fraud: first, a plaintiff can show that the transfer was made "with actual intent to hinder, delay, or defraud any creditor." ORS 95.230(1)(a). Secord, the plaintiff can prove "constructive fraud" by showing that the transfer was made "without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time." ORS 95.240(1).

15 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

*1. Badges of Fraud*

Plaintiff can show fraudulent transfer by proving that it was made "with actual intent to hinder, delay, or defraud any creditor." ORS 95.230(1)(a). This is a "case-by-case factual determination[,]" for which a court looks to a list of factors, or "badges of fraud." *Morris v. Nance*, 132 Or. App. 216, 221 (1994). This analysis "allows the inference of actual intent to be drawn from the presence of listed factors or other suspicious factual circumstances surrounding the transfer." *Id.* The factors include whether*:*

> the transfer or obligation was to an insider; (b) the debtor had retained possession or control of the property transferred after the transfer; (c) the transfer or obligation was disclosed or concealed; (d) before the transfer was made or obligation was incurred, the debtor was sued or threatened with suit; (e) the transfer was of substantially all the debtor's assets; (f) the debtor had absconded; (g) the debtor had removed or concealed assets; (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (j) the transfer had occurred shortly before or shortly after a substantial debt was incurred; and (k) The debtor had transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor.

*See* ORS 95.230(2). "According to the plain terms of ORS 95.230, the 'badges of fraud' included as factors in ORS 95.230(2) are to be weighed against evidence presented by the defendant to determine whether a transfer was made with actual intent to defraud or was a legitimate preference among creditors." *Morris v. Nance*, 132 Or. App. 216, 222–23 (1994). Badges of fraud, along with other evidence, may be used to infer intent or lack of intent. *Id.* "The burden of persuasion remains on the plaintiff to show actual intent by a preponderance of the evidence." *Id.*

Plaintiff alleges that the loan was part of a fraudulent scheme by the Darlands to avoid an adverse judgment by the arbitrator. SAC at 6. By making the secured loan prior the judgment of the arbitrator, Plaintiff asserts that the Darland's created a fraudulent "win-win." *Id.* If there was a judgment in favor III, it would have the finances to repay the Darlands. *Id.* And if there was a

16 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

judgment against III, the secured loan would allow the Darlands to abscond with the assets of the company and transfer them to CGI, avoiding judgment to III. *Id.*

Mr. Darland provides an alternative explanation. At trial, he explained that the loan was made to allow III to pay down its debt to Summit Bank and, therefore, to allow for the return of the inventory from III to TMP, in which Summit Bank had a secured interest. TT1 at 119. Mr. Darland testified that he didn't strictly need to provide this loan, but it served numerous purposes. It helped him preserve his reputation has a businessman in Eugene, particularly with Summit Bank; it allowed III to resolve the dispute over the inventory with TMP; and it allowed him to retain credibility with the State of Oregon as a reliable debtor when seeking future loans, as he would later do when founding GCI. TT1 at 119-120.

In weighing Mr. Darland's testimony and assessing the badges of fraud, I cannot infer that there was requisite intent to hinder, delay, or defraud TMP. To begin, neither the loan nor the assets were concealed from Plaintiff (badges (c) and (g)). As I determined in the factual findings, TMP was aware of the loan and would have had reason to assume that a loan of such value would have been secured. In fact, Plaintiff conceded that it was aware that there was a loan, arguing that it was fraudulent because Mr. Darland did not make is expressly known that it was secured. The facts also show that the loan was not concealed on the balance sheet in December of 2020, as Plaintiff alleges. In addition, because I find that the customer list was of little value and that Upward Spiral transaction was of reasonable value, I do not find that assets were concealed in the transaction.

Next, I conclude that the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred (badge (h)). As I conclude in my factual finding, the value of the transfer ($300,000) is a credible valuation of the

17 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

assets received by the Darlands in the CSA. This is primarily because I do not find that the so-called customer list had a value of $2.5 million, and because I find the Upward Spiral transaction to be a reasonably valued transaction with a third party. In the written closing argument, Plaintiff argues that no assets were owed to Mr. Darland in return for the secured loan to III because Mr. Darland also guaranteed the loan. TMP's Post Trial Brief at 10. I find this argument unpersuasive. The Court will not simply ignore the security interest in the assets of III because the loan was guaranteed.

      I also decline to find that the Darlands absconded with the substantially all of III's assets as part of the transfer (badges (e ), (k), (f)). Given that the CSA provided less value in collateral than the value of the loan, I conclude that the transfer was not of substantially all of debtor's assets. If the intent of Mr. Darland was to defraud III by removing assets from the company in order to start the new company, it would have made little sense for Mr. Darland to go to great lengths to pay back creditors, return inventory, sell all existing inventory, use all remaining cash to pay debts, and collect all accounts receivable and put them towards III.

      Similarly, the assets that were transferred to the Darlands were not the essential assets of the business. The essential assets of III for the majority of the business were the Copic products that III distributed until the DA was terminated in 2018. After this, the Darlands made desperate attempts to distribute other products, but this never resulted in profitability. TT2 at 9. Insofar as any product in the post-Copic business was essential, it was the Chameleon product, which amounted to roughly 50 percent of sales after the Copic DA was terminated. *Id.* at 8. However, nearly all of that inventory was returned to Chameleon when the company was dissolved; it was not claimed by the Darlands, except for "a couple boxes left over." TT2 at 8-9. Overall, the assets that were transferred to the Darlands were not trivial, but they were remaining inventory

18 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

that was left over, while the majority of assets, including inventory and accounts receivable, were used to wind up the company and "take care of III." TT2 at 11. With respect to badge (f), no party absconded with assets, as Plaintiff acknowledges. TMP's Post Trial Brief at 15.

Some badges of fraud are present, but they are not numerous or important enough for the Court to infer fraudulent intent. These badges include many undisputed facts about the parties and the timing of these transactions. For example, Mr. Darland was the president and CEO of III and a shareholder and on the board of III, and Mr. Darland and his wife are the co-owners of Global Creative. Therefore, the loan transaction was made to insiders and possession of the assets were retained by the debtor (III). With respect to timing, it is true that the debtor, III, was insolvent around the time of the transfer of the assets and that the transfer occurred around the time that the debt was incurred. However, though these facts bear some of the badges of fraud, they do not overcome wealth of evidence supporting Defendants' non-fraudulent explanation.

### 2. *Constructive Fraud*

Under ORS 95.240(1), a showing of "constructive fraud" can be made where the transaction is made "without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time." ORS 95.240(1). "Although the adequacy of consideration may also evince an actual intent to defraud, *see* ORS 95.230(2)(h), the proof under each theory is distinct and does not necessarily overlap." *Rapid Displays Inc. v. Gorder*, 155 Fed. Appx. 962, 966 (9th Cir. 2005). Because Plaintiff fails to show that the assets transferred in the collateral surrender agreement were without reasonably equivalent value, there is no basis for finding constructive fraud.

### III.     **Counterclaim for Sanctions**

19 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendants move for sanctions against Plaintiff, claiming that Plaintiff's claims are frivolous and constitute harassment. Def.'s Mot. for Summ. J. and Sanctions at 8. Because Plaintiff's claims were plausible in light of the facts known to Plaintiff at the time they brought this action, the motion for sanctions does not succeed.

## CONCLUSION

For the foregoing reasons, Plaintiff's first, second, and fourth claims are DENIED. Defendant's counterclaim for sanctions is DENIED.

IT IS SO ORDERED.

Dated this 14th day of March, 2024.

                                                         /s/ Michael McShane
                        Michael McShane
                        United States District Judge